UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERRIE DENISE WALKER,

                  Plaintiff,                     Civil Action No. 13-10498

        v.                        District Judge Avern Cohn
                                   Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                  Defendant.
_____/

**REPORT AND RECOMMENDATION TO GRANT IN PART
PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT [12]
AND DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

Plaintiff Sherrie Denise Walker appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her application for disability insurance benefits. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 11, 14). Three days after Plaintiff filed her original motion, she filed an amended motion for summary judgment that was virtually identical to the first motion. (Dkt. 12.) For the reasons set forth below, the Court concludes that Plaintiff has shown that the ALJ erred by not considering the decision of the Michigan Department of Human Services (Tr. 193-213) which concluded that Plaintiff was disabled and entitled to benefits. The Court therefore RECOMMENDS that Plaintiff's Amended Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

# I. BACKGROUND

Plaintiff graduated from high school and attended some college courses. (Tr. 31.) Plaintiff was previously employed as a warehouse worker and as a nurse's aide. (Tr. 30.) Plaintiff alleges that she had to stop working because she hurt her back while lifting patients. (Tr. 30.) To correct those injuries, Plaintiff underwent two back surgeries, but has been unable to sustain full-time work since May 8, 2009. (*Id.*) Plaintiff also claims that she suffers from depression and anxiety. (*Id.*)

## A. Procedural History

On June 23, 2009, Plaintiff applied for disability insurance benefits asserting that she became unable to work on May 8, 2009. (Tr. 107-115.) The Commissioner initially denied Plaintiff's disability application on December 7, 2009. (Tr. 56.) Plaintiff then requested an administrative hearing, and on July 18, 2011, she appeared with counsel before Administrative Law Judge Michael Finnie, who considered her case *de novo*. (Tr. 26-53.) In a September 14, 2011 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 21.) The ALJ's decision became the final decision of the Commissioner on December 21, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1-7.) Plaintiff filed this suit on February 7, 2013. (Dkt. 1, Compl.)

## B. Medical Evidence

Plaintiff underwent her first spinal fusion in 2004. (Tr. 276.) There are no medical records between 2004 and 2008. In December 2008, Plaintiff was seen at Oakwood Hospital where she complained of pain in her lower back and left buttock area, with radiation to the knee and sometimes to the ankle. (*Id.*) Plaintiff rated the pain an eight on a one-to-ten scale. (*Id.*) She reported that the pain increased when she sat up longer than ten minutes, when she drove, walked more than 30

minutes, when it was cold or rainy, or during physical activities such as bending. (*Id.*) Plaintiff indicated that she has been taking Vicodin to control the pain, which she reported "helps." (*Id.*) She also reported that the pain completely interferes with her general activity, mood, sleep, enjoyment of life, and ability to concentrate, and moderately interferes with her walking ability, normal work routine, and in her relationships with other people. (*Id.*) Plaintiff also indicated that her pain has "mildly" increased her appetite. (*Id.*) Following an assessment, Dr. Tawfiq Nakhleh recommended a left sacroiliac joint induction. (Tr. 277.)

In February 2009, Plaintiff presented to Dr. Malcolm Henoch with unexplained weight loss and epigastric pain. (Tr. 244.) Dr. Henoch recommended an upper endoscopy and colonoscopy. (*Id.*) On March 9, 2009, an MRI was done of Plaintiff's lumbar spine and hips. (Tr. 452-53.) Plaintiff's lumbar spine had a "stable postoperative appearance . . . without evidence of disc herniation, spinal canal stenosis, or neural foraminal narrowing." (Tr. 452.) Imaging of Plaintiff's hips was unremarkable. (Tr. 453.)

On March 12, 2009, Plaintiff began experiencing severe back and leg pain after attempting to move a 400 pound patient at work. (Tr. 296.) Following the work injury, Plaintiff was initially treated by physician's assistant Susan Bucknell at CMC-Det Airport Clinic. (Tr. 454.) Plaintiff was initially diagnosed with a lumbrosacral strain, sciatica, and a thigh/hip strain. (*Id.*) Plaintiff was expected to return to work on April 24, 2009, with the following restrictions: no lifting over 10 pounds, no bending, and no pushing and/or pulling over 10 pounds. (*Id.*) It appears that Plaintiff was seen a second time at the same clinic four hours later by Dr. Jai-Duck Liem. (Tr. 456.) She was given the same return to work date, but was limited to no lifting over five pounds, no bending greater than five times per hour, and no pushing and/or pulling over 10 pounds. (*Id.*)

3

On April 29, 2009, Plaintiff went to see Dr. Eric Kovan who diagnosed left sacroiliitis and mild radiculopathy. (Tr. 297.) Although Plaintiff's MRI was within normal limits, Dr. Kovan recommended injections, medications, and therapy. (*Id.*) On May 22, 2009, Plaintiff followed-up with Dr. Kovan and indicated that one of her goals was "to return to work." (Tr. 291.) At Plaintiff's June 10 follow-up, Dr. Kovan opined that Plaintiff "will not be able to work until after two to three months after surgery or after the Functional Recovery Program. Thus, I am not returning her to work until at least a year from today unless these treatments have been started and ultimately completed." (Tr. 289.)

On June 17, 2009, surgeon Roderick Claybrooks, M.D. consulted with Plaintiff regarding her low back pain. (Tr. 267-68.) Dr. Claybrooks recommended that Plaintiff undergo "conservative treatment" in the form of pain clinic management and that she stop smoking. (Tr. 268.) Dr. Claybrooks also told Plaintiff that she was a candidate for posterior revision lumbar fusion at L4-5 if she was not able to withstand the pain. (*Id.*) Less than a week later Plaintiff visited Dr. Claybrooks again complaining of back pain and generalized anxiety disorder. (Tr. 239-40.) On June 30, 2009, Dr. Claybrooks performed a lumbar laminectomy and fusion at L4-5. (Tr. 248.) Two weeks following surgery, Plaintiff complained of right-side burning and was prescribed Norco for pain. (Tr. 261.) At this time, Plaintiff required a cane for ambulation, but Dr. Claybrooks noted that her incision was healing "nicely." (*Id.*)

Following treatment with Dr. Claybrooks, Plaintiff also saw Dr. Kovan regarding back and leg pain. (Tr. 442.) Dr. Kovan's impressions were left sacroiliac pain and L5 radicular pain as well as right sacroiliitis. (*Id.*) Dr. Kovan scheduled her for a sacroiliac injection and maintained that the functional recovery program would be a good option. (*Id.*) Plaintiff saw Dr. Kovan again on August

4

26, 2009, due to her back and leg pain.  (Tr. 436.)  Dr. Kovan felt that the functional recovery

program was a necessity for Plaintiff and indicated that Plaintiff was "unable to work."  (*Id.*)

Plaintiff continued to take Norco, MS Contin, and Cymbalta for pain, and Xanax for anxiety.  (*Id.*)

On October 30, 2009, state examiners Dr. Terrance Mills and Suzann Kenna evaluated

Plaintiff to determine whether she was eligible for disability benefits.  (Tr. 307-10.)  The examiners

concluded that Plaintiff

> is able to understand, retain and follow simple instructions and
> generally restricted to performing simple, repetitive, concrete,
> tangible tasks.  Due to severe depression, panic disorder and PTSD,
> [Plaintiff] is restricted to work that involves brief, superficial
> interactions with coworkers, supervisors and the public. [Plaintiff] is
> subject to relapses and I suspect the pressure of employment would
> be a major factor that would result in decompensation on his/her part.

(Tr. 309.)  The examiners assigned Plaintiff a GAF score of 45-50 and concluded that her prognosis

was "guarded."[1]  (*Id.*)  The same day, Plaintiff was assessed by state medical examiner, Dr. S. Obri.

(Tr. 342.)  Dr. Obri concluded that Plaintiff presented with chronic back pain post-surgery, anxiety,

and depression.  (Tr. 343.)  During the exam, Plaintiff refused to undergo range of motion testing,

indicating that she was unable to bend due to severe pain.  (*Id.*)

---

[1] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders ( "DSM–IV" ), 30-34 (4th ed., Text Revision 2000).  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 32.

A GAF score of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.* at 34.

On November 12, 2009, Dr. Muhammad Ahmed conducted a physical assessment of Plaintiff in an attempt to determine her physical residual functional capacity. (Tr. 330-37.) Dr. Ahmed determined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk at least two hours in an eight-hour workday, and sit (with normal breaks) for a total of about six hours in an eight-hour workday. (Tr. 331.) In addition, Dr. Ahmed determined that Plaintiff must periodically alternate sitting and standing to relieve pain or discomfort. (*Id.*) Dr. Ahmed concluded that one year (12 months) following surgery, Plaintiff would be able to stand/walk unaided up to four hours in an eight-hour workday, and have a sit/stand option every 30 minutes for relief from pain or discomfort. (*Id.*) Dr. Ahmed indicated that Plaintiff should be occasionally limited from the following activities: climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 332.) And she should never climb on ladders, rope, or scaffolds. (*Id.*) Plaintiff should also avoid concentrated exposure to hazards (e.g., machinery, heights, etc.). (Tr. 334.) Dr. Ahmed indicated that there was no medical source statement regarding Plaintiff's physical abilities in the file. (Tr. 336.) In completing the case analysis, the state decision maker, Pretecia Collins, noted Plaintiff's two spine surgeries, but concluded that after 12 months post-surgery, Plaintiff would have the residual functions to return to work as outlined in the RFC. (Tr. 337.)

On December 1, 2009, medical consultant Dr. Yondell Moore reviewed the physical RFC assessment and agreed with the conclusions made therein. (Tr. 340.) In fact, Dr. Moore indicated that Plaintiff should not require a hand-held assistive device by June 30, 2010. (Tr. 339.) Moreover, Plaintiff will not need to periodically alternate sitting and standing to relieve pain or discomfort by June 30, 2010. (*Id.*) On December 2, 2009, Dr. Kovan indicated that Plaintiff was still having increasing pain. (Tr. 439.) Dr. Kovan noted that the psychological referral was denied by Plaintiff's

6

insurance company, which he deemed "medical negligence." (Tr. 439.) Dr. Kovan indicated that Plaintiff continued to have severe pain with positive MRI findings. (*Id*.) His impressions were right L5 radiculopathy with history of two surgeries, acute on chronic pain. (*Id*.) Dr. Kovan also noted depression and anxiety. (*Id*.) On February 24, 2010, Plaintiff met with Dr. Kovan regarding back and leg pain. (Tr. 446.) Dr. Kovan indicated that because of her pain, Plaintiff is "unable to work at this time or any time forward." (Tr. 446.) Dr. Kovan further concluded "even the sedentary job would be too painful for her. She needs to be on long-term disability." (*Id*.)

Several times after her second surgery, Plaintiff went to the University Pain Clinic at Harper University Hospital complaining of "constant" pain in her lower back. (Tr. 349.) On September 10, 2010, Plaintiff reported that her pain was a ten on a one-to-ten scale. (*Id*.) Plaintiff indicated that the pain is worst with dampness, weather changes, and movement, and it improves with lying down. (*Id*.) Moreover, Plaintiff explained that her pain frequently interferes with her daily activities. (*Id*.) Dr. Sruthl Rudraraju indicated that he prescribed pain medication and scheduled a joint injection for the following week. (Tr. 352.) Plaintiff saw Dr. Rudraraju again on November 16, 2010, when Plaintiff indicated that the joint injection was not successful in easing her back pain. (Tr. 358.) Plaintiff agreed to undergo the medial branch block (MBB). (*Id*.) Plaintiff also indicated that she was having difficulty with her insurance paying for her medications. (*Id*.) On December 16, 2010, Plaintiff had an MBB procedure and was discharged with a pain level of six on a one-to-ten scale. (Tr. 364.) Plaintiff followed up with Dr. Rudraraju on January 3, 2011, when she indicated that her back pain was an eight on a scale of one-to-ten. (Tr. 354.) Dr. Rudraraju recommended a lumbar medial branch block. (Tr. 355.) Plaintiff reported that her then-prescribed medication, Norco, was not helping and that Vicodin HP had been more effective in the past. (*Id*.) Plaintiff also indicated

7

that the lumbar MBB had given her 100% pain relief for about a day or two where she did not even need medication. (*Id*.) Dr. Rudraraju also gave Plaintiff samples of Celebrex to take as needed. (*Id*.) On January 27, 2011, Plaintiff underwent an MBB procedure and was discharged with a pain level of five on a one-to-ten scale. (Tr. 362.)

On July 15, 2011, Dr. Suman Patel completed a Certification of Health Care Provider for Employee's Serious Health Condition, a form associated with Plaintiff's application for benefits under the Family and Medical Leave Act. (Tr. 370-73.) On that form, Dr. Patel indicated that Plaintiff's condition began three years from the time he completed the form, or on or around July 2008. (Tr. 371.) Dr. Patel indicated that Plaintiff's condition lasted until around May 15 or 17, 2011. (*Id*.) Dr. Patel noted that he treated Plaintiff for the condition on the following dates: May 15, 2011, May 17, 2011, July 1, 2011, and July 14, 2011. (*Id*.) Dr. Patel concluded that Plaintiff was unable to perform her job functions, and included the date range of June 14, 2011 until July 24, 2011. (Id.) Dr. Patel noted that Plaintiff needed to attend follow-up treatment or work part-time or on a reduced schedule because of her medical treatment. (Tr. 372.) Dr. Patel estimated that Plaintiff would have periodic flare-ups which would occur three times per month and would prevent Plaintiff from performing her job functions. (*Id*.)

Plaintiff also has a history of mental illness. On November 11, 2009, Dr. Rose Moten-Solomon assessed Plaintiff's Mental Residual Functional Capacity. (Tr. 311-13.) In it, she determined that Plaintiff was "moderately" limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods of time. (Tr. 311.) Dr. Moten-Solomon also determined that Plaintiff was "moderately" limited in her ability to get along with coworkers or peers without distracting them

8

or exhibiting behavioral extremes.  (Tr. 312.)  In sum, Dr. Moten-Solomon concluded:

> The [Plaintiff] is not involved in [outpatient] treatment. She is prescribed psych meds by her AP. She complains mainly of pain. It does appear that is the [Plaintiff's] chronic pain that is contributing to her depressive symptoms. At the CE, the [Plaintiff] was in contact with reality, her speech was spontaneous, logical and organized. There is no evidence or allegations of thought or perceptual disturbances. The [Plaintiff] does possess cognitive strengths including the ability to sustain concentration as evidenced by her performance on the sensorium and mental capacity portion of the MSE. ADLs are limited primarily by physical. This consult is in agreement with the MSS statement as the [Plaintiff] appears capable of understanding, retaining and following simple instructions. There is however, no evidence that the pressure of employment would result in relapse and decompensation as indicated in the MSS statement. Simple work activity is not precluded.

(Tr. 313.)  Dr. Moten-Solomon also completed a Psychiatric Review Technique of Plaintiff.  (Tr. 315-28.)  In rating the "B" criteria, Dr. Moten-Solomon determined that Plaintiff was mildly limited in the activities of daily living, moderately limited in the area of social functioning, and moderately limited in her ability to maintain concentration, persistence or pace.  (Tr. 325.)  Dr. Moten-Solomon concluded that the evidence did not establish the presence of the "C" criteria.  (Tr. 326.)

On December 2, 2009, Dr. Kovan reported that Plaintiff was "doing poorly" and continued to take Xanax for her anxiety.  (Tr. 439.)  On January 29, 2010, Dr. Kovan indicated that Plaintiff continued to have trouble emotionally.  (Tr. 436-38.)  On July 14, 2010, Plaintiff was admitted for a two-day stay at Botsford Hospital for a possible drug overdose and suicidal ideations.  (Tr. 375-428.)  While Plaintiff's memory and concentration were intact, she had a depressed mood and a sad affect.  (Tr. 376.)  Plaintiff agreed to outpatient care and was discharged with relevant thought content and no hallucinations or delusions.  (*Id*.)  On August 8, 2011, psychiatrist Dr. Isha Sudindranath indicated that Plaintiff has a long history of psychiatric treatment, with an approximate

9

onset of 1983, and was last seen at Lincoln Behavioral Services on July 27, 2011. (Tr. 459.) Dr. Sudindranath noted Plaintiff's inability to perform effectively in a workplace setting and diagnosed her with major bipolar disorder-recurrent with psychotic features. (*Id.*) Plaintiff's therapists reported that this diagnosis negatively impacts Plaintiff's ability to perform tasks sufficiently to meet competitive workplace standards. (*Id.*) The therapists assigned Plaintiff a GAF of 39.[2] (*Id.*) According to Plaintiff's therapists, her present level of functioning "is moderate, marked by periods of severe depression and auditory hallucinations." (*Id.*) Moreover, within the past year, Plaintiff's symptomatology resulted in "disorienting conditions that causes extreme shifts in mood, i.e., sadness, anxiety, racing thoughts, loss of energy and hopelessness." (*Id.*)

### C. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

Plaintiff testified that she returned to work from April 29, 2011 until June 24, 2011, however, she was not able to sustain work because of her physical and emotional problems. (Tr. 32.) Plaintiff explained to the ALJ:

> A  I have pain.  I have sharp, shooting pain.  It hurts really bad.  It's really achy.  I have emotional problems.  I think about suicide a lot. I see a Psych, and a therapist.  I was diagnosed with Bipolar 2, and I forget the other one.
>
> Q  And you have some pain.  Is pain – is just back pain?
>
> A  Yeah, lower back pain down into the left buttock, down to the

---

[2] A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV at 34.

thigh and into my foot.

(Tr. 32.)   Plaintiff testified that she had experienced back pain since 2002 and that she had undergone two back surgeries, in 2002 and 2004.  (Tr. 33.)  Plaintiff indicated that the first surgery "failed" so they had to do a second surgery.  (*Id*.)  Following the second surgery, Plaintiff went back to work and reinjured herself trying to "turn a 400 pound guy over to give him a bath."  (*Id*.)  Plaintiff testified that because of her back pain she normally got out of bed at noon and went to bed at 8:00 p.m.  (Tr. 37-38.)  During the time she was awake, Plaintiff said that she watched television.  (Tr. 38.)  She indicated, however, that after 10-20 minutes she would be in pain and would need to get up and walk around a little bit and then lie down.  (Tr. 39-40.)  Plaintiff testified that her daughters helped her with cooking, cleaning, and with personal care needs (e.g., bathing and dressing).  (Tr. 38.)   Plaintiff testified that she occasionally used a cane, which was prescribed to her following her second surgery.  (Tr. 43.)

Plaintiff indicated that she took Dilaudid and Vicodin for pain management.  (Tr. 34.)  She took these medications when she was working, but they made it difficult for her to concentrate.  (Tr. 40.)  On a 1-to-10 scale, Plaintiff rated her pain when not on medication a 10 and when she took her pain medication a 6.  (Tr. 42.)  Plaintiff indicated, however, that she would be able to lift and carry 20 pounds occasionally if she took two Vicodin.  (Tr. 43.)  Plaintiff testified that she could not stand and walk for at least two hours total in an eight-hour work period and would not be able to sit for six hours in an eight-hour work day.  (Tr. 43.)  Plaintiff indicated that Dr. Suman Patel prescribed her pain medications and that she had seen Dr. Patel "off and on since [she had] been employed." (*Id*.)  Plaintiff testified that Dr. Patel was sending her for a CT scan of her back.  (*Id*.)  Plaintiff also complained that she had high blood pressure, but her doctors were attempting to control it with a

11

new medication.  (*Id.*)  She also indicated that she suffered from TIA.[3]  (*Id.*)  Plaintiff also stated

that she had syncope and thyroid disease and that she had been taking synthroid.  (Tr. 34-35.)

Plaintiff indicated that her doctor told her that her condition was not going to improve and

considering the type of work she did, her condition would just get worse if she returned to work.

(Tr. 36.)

Plaintiff also testified to psychological problems.  (Tr. 36.)  She indicated that she was

diagnosed with depression and bipolar disorder when she was a "little girl," but she never sought

treatment.  (*Id.*)  Following a first suicide attempt, however, she sought treatment with a therapist.

(*Id.*)  Plaintiff was on medications, but she still heard voices.  (Tr. 37.)  Plaintiff indicated that the

only time she had any inpatient treatment was following a second suicide attempt, when she was

kept overnight for three days.  (*Id.*)   Plaintiff also testified to experiencing anxiety when around

people.  (Tr. 39.)

### 2. *The Vocational Expert's Testimony*

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs

would be available for someone with functional limitations approximating Plaintiff's.  The ALJ

asked about job availability for a hypothetical individual of Plaintiff's age, education, and work

experience who:

---

[3]  Plaintiff does not define TIA in her testimony, however, for purposes of this Report and Recommendation the Court will assume that Plaintiff means Transient Ischemic Attack ("TIA"). "A transient ischemic attack (TIA) is like a stroke, producing similar symptoms, but usually lasting only a few minutes and causing no permanent damage.  Often called a mini stroke, a transient ischemic attack may be a warning. About 1 in 3 people who have a transient ischemic attack eventually has a stroke, with about half occurring within a year after the transient ischemic attack." *See* http://www.mayoclinic.com/health/transient-ischemic-attack/DS00220 (last visited Oct. 28, 2013).

has at least moderate difficulties maintaining concentration, persistence, and pace such as they are limited to simple, routine tasks consistent with unskilled work. And further, at least moderate difficulties in social functioning such that they [are] limited to no more than occasional contact with the general public and coworkers. Further had a physical residual functional capacity along the lines of Exhibit 9F, which would allow for occasional lifting less than 10 pounds, frequently carrying and lifting less than 10 pounds. Standing and walk[ing] with normal breaks at least two hours in an[] eight hour work day. Sitting with normal breaks for about six hours in an[] eight hour work day. No limitations with regard to pushing, pulling, and operation of hand and foot controls. Capable of occasional climbing or ramps and stairs, occasional balancing, stooping, kneeling or crouching. Avoiding concentrated exposure to hazardous moving machinery or unprotected heights.

(Tr. 47-48.) The VE responded that Plaintiff's past work was precluded. (Tr. 48.) The ALJ next asked whether jobs existed at the sedentary exertional level, if the hypothetical individual required an option to periodically sit or stand. (Tr. 48.) The VE responded that the following sedentary, unskilled jobs qualified: order clerk, charge account clerk, and cutter and paster. (Tr. 49.) If the hypothetical individual was limited to more than occasional contact with supervisors, it would not have any impact on the jobs listed above. (*Id.*)

The VE then testified that a hypothetical individual who could occasionally lift and carry 20 pounds or less, stand and walk for less than two hours in an eight hour day, and sit for six hours in an eight hour day, if it added up to substantially less than an eight hour day, would be unable to perform the jobs listed above. (Tr. 49.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Finnie found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of May 8, 2009. (Tr. 14.) At step two, he found that Plaintiff had the following severe impairments: degenerative disc disease of the spine status post surgery,

14

affective disorder, and anxiety related disorder.  (*Id.*)  Next, the ALJ concluded that none of these

impairments, alone or in combination, met or medically equaled a listed impairment.  (*Id.*)  Between

steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to:

> perform sedentary work . . . in that the claimant can lift and carry 10
> pounds occasionally and less than 10 pounds frequently; stand and
> walk for at least 2 hours of an 8 hour day with an option to alternate
> sit/stand; sit for 6 hours of an 8 hour day; occasional[ly] climb
> ramp/stairs, balance, stoop, kneel, crouch, no climbing,
> ladders/ropes/scaffolds; and avoid concentrated exposure to
> hazardous moving machinery and unprotected height[.]

(Tr. 16.)  The ALJ also restricted Plaintiff to "simple routine tasks with no more than occasional

contact with the general public."  (*Id.*)  At step four, the ALJ found that Plaintiff was unable to

perform any past relevant work.  (Tr. 19.)  At step five, the ALJ found that sufficient jobs existed

in the national economy for someone of Plaintiff's age, education, work experience, and residual

functional capacity.  (*Id.*)  The ALJ therefore concluded that Plaintiff was not disabled as defined

by the Social Security Act from the alleged onset date through the date of his decision.  (Tr. 21.)

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm

the Commissioner's conclusions absent a determination that the Commissioner has failed to apply

the correct legal standard or has made findings of fact unsupported by substantial evidence in the

record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation

marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it

is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

### A. The Treating-Source Rule

Plaintiff argues that the ALJ did not give controlling weight to her treating physicians, nor

did he explain the reasons for not doing so.[4]  (Pl.'s Mot. Summ. J. at 6-7.)  Plaintiff alleges that had

the ALJ afforded these opinions their proper weight, she would have received a favorable decision.

(*Id*. at 7.)

      Under the treating-source rule, the opinions of a claimant's treating physicians are generally

given more weight than those of non-treating physicians because treating sources "are likely to be

the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's]

medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone or from reports of individual examinations, such

as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c) (2), 416.927(c)(2).

In fact, if the opinion of a treating physician is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your

case record," then an ALJ must give the opinion "controlling" weight.  20 C.F.R. §§ 404.1527(c)

(2) 416.927(c)(2); *see also Wilson* , 378 F.3d at 544. And when an ALJ does not accord the treating

physician's opinion controlling weight, he must consider the non-exhaustive list of factors set forth

at 20 C.F.R. §§ 404.1527(c), 416.927(c) to determine how much weight to assign the opinion.

*Rogers*, 486 F.3d at 242; *accord Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir.

2013).

      The treating-source rule additionally includes a procedural requirement that an ALJ provide

---

[4]  As outlined in the medical evidence of this Report and Recommendation, and as acknowledged by the Commissioner in its motion to this Court, Plaintiff was treated by Dr. Kovan "several times" between April 2009 and February 2010, including being prescribed medications and injections for pain relief.  (*See* Def.'s Mot. Summ. J. at 7.)  As such, despite the Commissioner's argument to the contrary, this Court concludes that Dr. Kovan qualifies as a treating source.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting former 20 C.F.R. § 404.1527(d)(2), now § 404.1527(c)(2)); *see also* S.S.R. 96-2p, 1996 WL 374188 (1996).

"good reasons" for the weight he assigns a treating-source opinion. *See e.g., Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. There are three reasons for this explanatory requirement: (1) "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied," (2) to "ensure[ ] that the ALJ applies the treating physician rule," and (3) to "permit[ ] meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. This procedural right is substantial: abridgement typically warrants remand even if substantial evidence supports the ALJ's disability determination. *See Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

Plaintiff argues that the ALJ impermissibly discounted Dr. Kovan's February 24, 2010 opinion that she was unable to work, and that even sedentary employment would be too painful for her. (Pl.'s Mot. Summ. J. at 3, *citing* Tr. 446.)   Plaintiff additionally relies on Dr. Kovan's statement that she "needs to be on long-term disability." (*Id.*)  The law is clear, however, that it is the ALJ who is exclusively tasked with making the ultimate decision on whether a claimant is disabled within the meaning of the Social Security Act.  20 C.F.R. § 404.1527(d)(1). Therefore, although ALJ Finnie could not completely ignore Dr. Kovan's finding of disability, he did not owe that conclusion any particular deference. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 492-93 (6th Cir. 2010) ("[W]hen a treating physician submits a medical opinion, the ALJ must either defer to the opinion or provide 'good reason' for refusing to defer to the opinion. . . . When a treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is 'disabled' or 'unable to work'—the opinion is not entitled to any particular

18

weight."); *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010) (holding that ALJ did not inappropriately disregard treating physician's statement that claimant was "100% disabled" because the regulations reserved this determination to the Commissioner (*citing* former 20 C.F.R. § 404.1527(e)(1), (e)(3) now 20 C.F.R. § 404.1527(d)(1), (d)(3))).

Plaintiff did not identify any functional limitation findings provided by Dr. Kovan. The absence of such findings is confirmed by the Court's review of the record and by Dr. Ahmed, who after reviewing the record, also determined that there was no medical source statement in the file. (Tr. 336.) For example, Dr. Kovan never opined on how far Plaintiff could walk, how much she could lift, or how long she could sit. The ALJ reasonably concluded, therefore, that Plaintiff could perform a restricted range of sedentary activities. (Tr. 16.) For these reasons, Plaintiff has not shown that the ALJ erred by giving Dr. Kovan's opinion evidence less than controlling weight. *See Watson v. Comm'r of Soc. Sec.*, 2013 WL 1788576 (E.D. Mich. Mar. 11, 2013).

With respect to Dr. Sudindranath's opinion, Plaintiff argues that her psychiatrist's diagnosis of "major depression disorder with recurrent psychotic features," panic attacks, and her inability to perform in a workplace setting were impermissibly discounted by the ALJ. (Pl.'s Mot. Summ. J. at 6, *citing* Tr. 459.) But, as noted by the Commissioner, Dr. Sudindranath's opinion (dated August 1, 2011) was not before the ALJ at the time he issued his decision on September 14, 2011. Instead, the evidence was submitted to the Appeals Council as an exhibit for their review. (Tr. 5.) Judicial review of the Commissioner's final decision is based only on the evidence of record compiled by the agency and before the ALJ at the time of his decision. *See Mathews v. Weber*, 423 U.S. 261, 270 (1976); *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007) ( "Only evidence in the record below can be considered [by the court] when determining whether or not the ALJ's opinion was

supported by substantial evidence. . . .")  Therefore, a reviewing court may not look outside that record in reviewing the correctness of the ALJ's decision.  *See Mathews*, 423 U.S. at 270; *Cotton v. Sec'y of HHS*, 2 F.3d 692, 695 (6th Cir. 1993); *see also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.").  Because Dr. Sudindranath's August 1, 2011 opinion was not considered by the ALJ below, and because Plaintiff has not requested a sentence six remand pursuant to 42 U.S.C. § 405(g), this Court cannot consider whether the ALJ improperly weighed it in his substantial evidence analysis.  For these reasons this Court concludes that Plaintiff has not identified any errors with the ALJ's weighing of the opinion evidence.

### B.  The ALJ Failed to Adequately Consider the State Disability Decision

Plaintiff also alleges that the ALJ erred when he failed to take into account the Michigan Department of Human Services decision concluding that Plaintiff is disabled and entitled to benefits. (Pl.'s Mot. Summ. J. at 8; Tr. 193-213.)  On April 13, 2010, Department of Human Services ALJ Colleen Mamelka concluded:

> Claimant has participated in physical therapy, had epidural injections, and two spinal fusions, all in [an] effort to alleviate her pain.  The Claimant's primary physician opined that Claimant, at this point and for at least a year, is unable to work to include sedentary employment.  In light of the foregoing, it is found that the combination of the Claimant's physical and mental impairments have an affect on her ability to perform basic work activities such that the Claimant is unable to meet the physical and mental demands necessary to perform even sedentary work as defined in 20 CFR 416.967(a).

(Tr. 211.)

20

While the decision of another governmental agency is not binding on an ALJ, S.S.R. 06-03p provides that "evidence of a disability decision by another governmental or non-governmental agency cannot be ignored and *must be considered*." S.S.R. 06-03, 2006 WL 2329939, at *3 (Aug. 9, 2006) (emphasis added); *see also Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 717 (S.D. Ohio 2012) (citing *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002) (citing to decisions from nine circuits holding that an ALJ must, at a minimum, consider other federal agencies' disability findings)). Importantly, Courts in this District have held that an ALJ should explain the consideration given to other agency decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases. *See McPhee v. Comm'r of Soc. Sec.*, No. 12-13931, 2013 WL 3224420, at *13 (E.D. Mich. June 25, 2013); S.S.R. 06-03p, 2006 WL 2329939 at *7. Moreover, the Sixth Circuit has also held that other agency decisions should be taken into account. *See Harris v. Heckler*, 756 F.2d 431, 434 (6th Cir. 1985).

The relative weight to be given to another agency's determination, however, will vary depending on the factual circumstances of the case, but "ALJ's need not give 'great weight' to a [state agency] disability determination if they adequately explain the valid reasons for not doing so." *King v. Comm'r of Soc. Sec.*, 779 F. Supp. 2d 721, 725 (E.D. Mich. 2011.) Two decisions from this Court underscore the importance, and necessity, of the explanatory requirement that ALJ's must provide to reviewing courts. First, in *Burrows v. Commissioner of Social Security*, No. 12-10109, 2012 WL 5411112 (E.D. Mich. Sept. 28, 2012), plaintiff testified that she was approved for state disability benefits and at the time of the hearing was receiving benefits. *Id.* at *13. The District Court noted that the ALJ did not seek or obtain records related to the Plaintiff's application for state disability benefits and that he did not give any consideration to the disability determination made

21

by the State. *Id.* The District Court remanded the matter to the ALJ to obtain records pertaining to the plaintiff's approval for disability and to explain the consideration he gave to such records in formulating his decision as to whether the plaintiff was disabled under the Act. *Id.* In a second case, the ALJ stated that she considered the Veteran's Affairs ("VA") determination that plaintiff had 100% permanent disability, and even cited the regulation that states that another agency's disability decision does not bind the Commissioner, but did not explain whether she accorded any weight to the VA determination. *King v. Comm'r of Soc. Sec.*, 779 F. Supp. 2d 721, 726 (E.D. Mich. 2011). The District Court concluded "there may be good reasons for disregarding the determination, but the Court on review is left to speculate on the ALJ's rationale in the absence of any meaningful discussion of the evidence," and thus remanded the case "for further consideration of the evidence in light of a better-developed record of the VA disability determination." *Id.* at 727; *see also McPhee v. Comm'r of Soc. Sec.*, 2013 WL 3224420 (E.D. Mich. Jun. 25, 2013) (remanding and following *Burrows* and *King*).

It is not clear from ALJ Finnie's decision whether he considered ALJ Mamelka's conclusion from the Michigan Department of Human Services which determined Plaintiff to be disabled. In fact, ALJ Finnie did not even mention the state disability determination, let alone adequately explain his reasons for discounting it. The Commissioner's post-hoc attempt to rationalize ALJ Finnie's failure to consider the Michigan Department of Human Services decision in the first instance runs afoul of the District Court's previous rulings in *Burrows* and *King*. For these reasons a remand is necessary to enable ALJ Finnie an opportunity to better develop the record in light of the Michigan Department of Human Services' conclusion.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court RECOMMENDS that Plaintiff's Amended Motion for Summary Judgment (Dkt. 12) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  October 29, 2013

23

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 29, 2013.

s/Jane Johnson
Deputy Clerk